**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 18-CR-80160-DIMITROULEAS**

**UNITED STATES OF AMERICA**

**vs.**

**CLAUDIA PATRICIA DIAZ GUILLEN,**
**ADRIAN JOSE VELASQUEZ FIGUEROA,**

      **Defendants.**
_____/

**THE GOVERNMENT'S SENTENCING MEMORANDUM**

The defendants, Claudia Patricia Diaz Guillen ("Diaz") and Adrian Jose Velasquez Figueroa ("Velasquez") (collectively Diaz and Velasquez are referred to herein as the "Defendants") are scheduled to be sentenced Wednesday, April 19, 2023. The Government respectfully submits this memorandum in connection with their sentencing.

**I.**     **PRELIMINARY STATEMENT**

Both Defendants played a critical role in an immense bribery and money laundering scheme that moved over a billion dollars' worth of bonds owned by the Venezuelan National Treasury to fugitive co-defendant Raul Gorrin Belisario ("Gorrin") resulting in hundreds of millions of dollars in profits used to pay bribes and line the pockets of the Defendants and others who masterminded the scheme. As proven at trial, the Defendants—both well-educated, economically sophisticated, high-ranking military officers, and specifically, Diaz who was the Treasurer of Venezuela, entrusted by the people of Venezuela to be a steward of their national wealth—acted to execute their part in the scheme knowingly and deliberately, and profited substantially by taking more than $136 million in bribes for themselves. Their participation in a crime so audacious was a choice, and it warrants substantial punishment.

As the National Treasurer of Venezuela, defendant Diaz's role was crucial to the success of the scheme.  She was the high-ranking foreign official who accepted bribes from Venezuelan billionaire businessman Gorrin in exchange for approving the assignment of bonds owned by the Venezuelan National Treasury to Gorrin-controlled companies.  After exchanging the bonds on the open market where Gorrin was able to take advantage of the unofficial exchange rate for the Venezuelan bolivar, Gorrin paid the Venezuelan National Treasury at the Venezuelan government's fixed rate of exchange (which overvalued the bolivar), pocketing massive profits because of the arbitrage.  Once done, defendant Diaz received what she had been promised in exchange—bribe payments totaling more than $136 million—which defendant Velasquez, her husband, nominee, and front man, concealed through the creation and use of shell companies and offshore bank accounts.

The Defendants must be held to account.  Foreign corruption is a plague with great impact where it takes place, with serious consequences here in the United States.  Corruption undermines the rule of law, empowers authoritarian rulers, distorts free and fair markets, disadvantages honest and ethical companies, threatens national security and sustainable development, and is deeply unfair to everybody else who plays by the rules.  The Defendants' sentences must send a strong warning to those who would choose to use the United States financial system to conceal their corruption, both here and abroad.  The United States is not a safe harbor for criminals.  The Defendants' joint sentencing memorandum, however, seeks to minimize their conduct while resisting the jury's verdict.  As they tell it, this was all a big misunderstanding between cultures as the Venezuelan economic market is different than the American economic market, and the permuta market in Venezuela allows Venezuelans to make money from the purchase and sale of currency. They claim that defendant Velasquez was doing a perfectly legal exchange of currency.  Further,

defendant Diaz again proffers that anyone could bid and win Treasury bond contracts after the abolishment of the casa de bolsas, implying she had no power or authority as the National Treasurer to select who won these contracts.  The jury found otherwise.  She also argues that the Venezuelan National Treasury made a profit on the transactions so there were no victims.  No harm, no foul. [DE 358 at 18-24].  Finally, the Defendants list a myriad of alleged dramatic and traumatic personal experiences they supposedly endured in the intervening years since leaving Venezuela and prior to their arrest as punishment enough. [*Id*. at 26-30].  Taking these factors altogether they seek a sentence of 2 months to 4 years despite an effective Guidelines term of 480 months' imprisonment for defendant Diaz and a Guidelines term of 235–293 months' imprisonment for defendant Velasquez—that is, up to an approximately 99% plus reduction in both of their sentences.

The Defendants are not entitled to the truly extraordinary sentences that they seek.  The Defendants were proven guilty at trial.  Despite defendant Diaz's testimony at trial, the jury found that the evidence presented showed the opposite of what they now argue.  Defendant Diaz was a corrupt public official who sold her office, and defendant Velasquez was her front man, a greedy and willing accomplice in orchestrating the financial mechanisms necessary to conceal her bribe payments.  The over $136 million received is an astounding amount of money, drastically changing the middle-class life of the Defendants to one of multiple private jets, yachts, luxurious world travel, and even a high-end fashion line.  The Defendants committed their crimes knowingly and deliberately over several years.  And a jury returned guilty verdicts because of the actions they chose to take.

Defendant Diaz faces a Guidelines term of life and an effective Guidelines term of 480 months' imprisonment, and defendant Velasquez faces a Guidelines term of 235–293 months' imprisonment.  These ranges appropriately reflect the serious nature of their extensive and

deliberate criminal conduct.  Although the Government agrees that a sentence at or near this range is unwarranted in this instance for defendant Diaz, for the reasons set forth herein, the Court should nonetheless reject the Defendants' extraordinary request to avoid meaningful punishment.  Instead, the Government urges the Court to sentence defendant Diaz to a substantial term of imprisonment of no less than 283 months and defendant Velasquez to a substantial term of imprisonment at the low end of his Guidelines range of no less than 235 months.[1]

## II.        FACTUAL AND PROCEDURAL BACKGROUND

On December 15, 2020, a federal grand jury returned a Superseding Indictment charging the Defendants in Count 2 with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), and in Counts 9-10 with money laundering in violation of 18 U.S.C. § 1956(a)(2)(A). Superseding Indictment [DE 44].  These charges arose from the Defendants' roles in a bribery and money laundering scheme.   In furtherance of the scheme, the Defendants sought to unlawfully enrich themselves and their co-conspirators by accepting bribe payments, as defendant Diaz was a Venezuelan government official, to ensure that co-conspirators were able to obtain improper business advantages, including the approval of foreign currency exchange contracts, and then to promote that bribery scheme through financial transactions that occurred, in part, in the United States.

On December 23, 2020, the Defendants were arrested in Spain pursuant to a provisional arrest warrant on December 23, 2020.  Extradition was sought and on May 13, 2022, defendant Diaz appeared in court, having been extradited from Spain and on October 14, 2022, defendant Velasquez appeared in Court, having been extradited from Spain.

At trial, the Government introduced evidence showing that fugitive co-defendant Gorrin

---

[1] This amount is based on the Government's proposed calculation of the total offense level as discussed below.

paid over $136 million in bribes to defendant Diaz, through Defendant Velasquez,[2] in order to grant Gorrin access to purchase bonds from the Venezuela National Treasury at a favorable exchange rate, resulting in hundreds of millions of dollars of profit.[3]  The bribes paid to defendant Diaz, through defendant Velasquez, came in the form of multimillion dollar transfers to accounts controlled by or ultimately benefitting defendant Velasquez,[4] and through the purchase of luxury goods for the Defendants including private jets,[5] yachts,[6] and a high-end fashion company.[7]

On December 13, 2022, after a trial, a jury returned a verdict convicting defendant Diaz on

---

[2] *See, e.g..,* Trial Tr. at 194:20-25, 213:3-217:21, 221:10-223:24, 228:11-229:13, 232:24-234:23, 249:10-250:7; GXs 11, 11A, 13, 13A, 16, 16A, 18, 18A, 20, 20A, 25, 25A, 26, 26A, 28, 28A, 32, 32A; 98, 98A, 101-103, 101-103A, 105-106, 105A-106A, 109-120, 109A-120A, 135, 135A.

[3] *See, e.g.,* GX 704, 705, 706, 707, 708, and 709 (Bellsite bank account records reflecting receipt of funds into a Gorrin-controlled account related to the currency assignments from the ONT); see also GX 802, 803, 809, 817, 818, 819, 820, 821, 822, 823, 824, and 825 (Vineyard Ventures bank account records reflecting receipt of funds into a Gorrin-controlled account related to the currency assignments from the ONT); see also GX 503, 504, 505, 506, and 507 (IBCDB bank account records reflecting receipt of funds into a Gorrin-controlled account related to the currency assignments from the ONT); see also GX 63, 806, and 807 (bank records reflecting transfer of funds from Gorrin-controlled Vineyard Ventures account to the Velasquez-controlled account Invesco).

[4] *See, e.g.,* GXs 309 (transfer of over $4 million from Vineyard Ventures to Invesco); 311 (transfer of over $17 million for Bellsite to Invesco); 710, 711, and 712 (bank records reflecting transfer of funds from Gorrin-controlled Bellsite account to the Velasquez-controlled account Invesco); *see also* GX 131 and 131a (listing Claudia Diaz as a receiver or VEF 100,000 on or about July 4, 2013)GX 309 and 311.

[5] Trial Tr. 872:9-14; GXs 123, 123A (purchase of N90RZ for $6,405,000), 141, 141A (same), 252, 252A (purchase of N64AV for $5,700,000), 242, 242A (purchase of N452AC for $23,400,000); Dec. 2 Tr. at 873:22-874:14, 875:25-876:12, 881:21-883:6, 883:16-886:8.

[6] Trial Tr. 761:6-762:8 (Gorrin paid for Defendants' yachts), 785:13-21 (Velasquez was using *Oro*); 803:19-25, 805:15-18 (*Sean* yacht was Velasquez's), 808:18-19 (Gorrin paid for *Sean* yacht); Trial Tr. at 1128:15-20 (*Oro* was a payment by Gorrin for FOREX contracts signed by Diaz); 120, 120A (showing payments by Gorrin to Patric Love, MJ Box Tool, Interglobal Yacht Sales), 135, 135A (showing payments by Gorrin to Patric Love and for the "ORO"), 98, 98A (discussing and showing payments by Gorrin to Interglobal Yacht Sales and Unique Jet Aviation),875:1-9; Dec. 5 Tr. at 1128:15-20 (*Oro* was a payment by Gorrin for FOREX contracts signed by Diaz); There was only $86,044.80 in payments in Gorrin's spreadsheets for the Oro (GX 1150 at 1), and although there was only one transaction for Interglobal, a yacht broker, for $873,181 (GX 1150 at 5), and the Sean's declared value was $3.9 million (GX 199.)  Similarly, while Gorrin paid $35,505,000 for the three airplanes through Unique Aviation (see supra), the spreadsheets account for only $6,356,071.46. (GX 1150 at 1.)

[7] *See, e.g.,* GXs 120, 120A (showing payments by Gorrin to Patric Love); 135, 135A (showing payments by Gorrin to Patric Love); 148, 148A (noting "charge" for $4 million payment to Patric Love for "AV"); and 149, 149A (Patric Love invoice forwarded to Gorrin for payment).

Counts 2 (conspiracy to commit money laundering) and 10 (money laundering), and defendant Velasquez on Counts 2, 9 (money laundering), and 10.  *See* Trial Minute Entries, DE Nos. 275-76, 278-79, 281, 286, 292, 295, 298, 300, 304, 307; Jury Verdict, DE No. 310.

## III.   <u>APPLICABLE PENALTIES</u>

For the reasons set forth below, (1) the applicable Guidelines term of imprisonment in defendant Diaz's case is reduced from life to 480 months due the statutory maximum penalty that can be imposed against her, and the applicable Guidelines term of imprisonment in defendant Velasquez's case is a term of imprisonment of 235–293 months; (2) forfeiture is mandatory on the offenses of conviction and should be ordered in the amount of $136,752,007.46; and (3) the Defendants have not met their burden to show that they cannot pay a fine, and, as a result, the Court should consider the imposition of a fine.  The United States recommends a fine of $75,000, slightly above the low-end fine recommendation.

### 1.   **The Applicable Guidelines Terms**

The government respectfully submits that the appropriate Guidelines calculation is set forth below:[8]

### 1.   **Claudia Patricia Diaz Guillen**

| | |
|---|---|
| Base Offense Level (USSG § 2S1.1(a)(1)): | 48 |
| (SUA is FCPA calculated pursuant to | |
| USSG § 2C1.1, including base offense level 14 public | |
| official, more than one bribe, value of benefit received in | |
| excess of $250 million and high-level official) | |
| Conviction Under 1956 (USSG § 2S1.1(b)(2)(B)): | +2 |

---

[8] The Government differs only slightly from the Probation Office's Guideline calculations and incorporates by reference our objections to both Defendants' Draft PSRs. [DE 351 and 354].  In short, as it relates to defendant Diaz, the Government concurs in the Probation Office's calculations, however, submits that she should also receive a two-level enhancement for more than one bribe, an additional four-level enhancement for over $250 million in the benefit received (add 28), and a two-level enhancement for obstruction of justice for an additional 8 levels, for a total offense level of 54, not 46.  As it relates to defendant Velasquez, the Government concurs in the Probation Office's calculations, however, submits that he should also receive a two-level enhancement for his aggravating role in the offense, for a total offense level of 38, not 36.

| | |
|---|---|
| Sophisticated Laundering (USSG § 2S1.1(b)(3)): | +2 |
| Obstruction of Justice (USSG § 3C1.1) | +2 |
| Total Offense Level: | 54 |

Based upon these calculations, defendant Diaz's advisory Sentencing Guidelines range is life.  However, the Guidelines state that in those "rare cases" where the offense level is more than 43, the offense level will be treated as a level 43. USSG § 5A cmt 2.  Defendant Diaz has a criminal history score of zero, and thus a criminal history category of I.  Based on the total offense level of 43 and a criminal history category of I, the defendant's Guidelines range of imprisonment would have been life.

However, since the statutorily authorized maximum sentences are less than the minimum of the applicable Guidelines range (specifically, the maximum term of imprisonment for Counts Two and Ten is twenty years each), the restricted Guidelines term of imprisonment is 480 months.

### B.    Adrian Jose Velasquez Figueroa

| | |
|---|---|
| Base Offense Level (USSG § 2S1.1(a)(2)): | 32 |
| (base offense level 8, bribes in excess of | |
| $65 million and high-level official) | |
| Conviction Under 1956 (USSG § 2S1.1(b)(2)(B)): | +2 |
| Sophisticated Laundering (USSG § 2S1.1(b)(3)): | +2 |
| Role in Offense (USSG § 3B1.1I) | +2 |
| Total Offense Level: | 38 |

In accordance with the above, the defendant's total offense level is 38.  Defendant Velasquez has no known prior convictions, so his criminal history category is I.  Based upon these calculations, the defendant's advisory Sentencing Guidelines range is 235 to 293 months' imprisonment.

### 2.  The Court is Required by Statute to Order Forfeiture

Under 18 U.S.C. § 982(a)(1), defendants must forfeit all property "involved in" their money laundering offense. *United States v. Waked Hatum*, 969 F.3d 1156, 1165 (11th Cir. 2020) ("a person convicted of federal money laundering 'must forfeit to the government all property that is either involved in that violation or traceable thereto'") (citation omitted).  The property "involved in" money laundering includes the property actually laundered ("the corpus"), which here is the bribes that defendants accepted. *United States v. Seher*, 562 F.3d 1344, 1368 (11th Cir. 2009).  And in a conspiracy, as here, defendants must forfeit *all* laundered amounts, and not just the amounts involved in the substantive charges or overt acts. *Seher*, 562 F.3d at 1373 ("as he was convicted of conspiracy to launder money, it is reasonable to hold him liable for all the proceeds that were a reasonably foreseeable result of that conspiracy regardless of whether he still possesses them"); *United States v. Baker*, 227 F.3d 955, 969 (7th Cir. 2000) (defendant forfeits total amount of proceeds involved in the conspiracy, not just amount involved in substantive offenses or overt acts).

Here, forfeiture is warranted in the total amount of the Defendants' bribes, their illegally obtained gains from the scheme, which the government proved at trial totaled at least $136,752,007.46 million.  *See also* Mot. for Prelim. Order of Forfeiture at 10-12 (providing evidentiary basis for forfeiture amount), DE 338; Reply at 1-6 (same), DE 349.  The Court should enter the proposed order of forfeiture. *See* Proposed Order of Forfeiture, DE 338-15.

### 3.  The Court Has Discretion to Order the Defendants to Pay Fines

Title 18, United States Code, Section 3572(a) sets forth the factors to be considered by the Court before imposing a fine, in addition to the factors set forth in Section 3553(a).  Those factors include: (1) the defendant's income, earning capacity, and financial resources; (2) the

8

burden that a fine will impose upon the defendant and any dependents; (3) any pecuniary loss inflicted upon others as a result of the offenses; (4) whether restitution is ordered; (5) the need to deprive the defendant of illegally obtained gains from the offenses; and (6) the expected costs to the government of any imprisonment. 18 U.S.C. § 3572(a).

The Guidelines provide, in turn, that a district court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a) (emphasis added). The Guidelines further provide that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." *Id*. The defendant bears the burden of demonstrating an inability to pay a fine at present and in the future.

Here, as set forth in the PSR, no restitution is warranted. [*See* DE 350 ¶54 and DE 352 ¶54]. As a result, whether a fine will impose a "burden" on the defendant and whether a fine, taken together with other sanctions, is sufficiently "punitive," will depend on the amount of forfeiture the Court ultimately imposes. As set forth in defendant Diaz's PSR, the maximum fine on Count Two is $273,504,014.92 and the maximum fine on Count Ten is $8,000,000, for a total potential maximum fine of $281,504,014.92. And as set forth in defendant Velasquez's PSR, the maximum fine on Count Two is $273,504,014.92, the maximum fine on Count Nine is $500,000, and the maximum fine on Count Ten is $8,000,000 for a total potential maximum fine of $282,004,014.92.

The Probation Office has concluded, based on a review of the financial information that the Defendants provided to the Probation Office, that they don't have the ability to pay a fine. [*See* DE 350 ¶94 and DE 352 ¶97]. However, this conclusion is, in part, based on the fact that the Defendants refused to properly list their assets to the Probation Office.

All indications are that the Defendants have assets and financial support even though sanctioned by OFAC.  In addition to the unanswered financial questions raised in the Government's objections to the Defendant's PSRs [DE 351 and 354], the Court should consider that, first, they have retained private attorneys to defend them in this criminal case and appear to have recently obtained another separate attorney for appellate purposes. Second, they have been living in Madrid, Spain for years in a residence.  Third, prior to their arrival in the United States the Defendants had retained counsel.  Fourth, defendant Velasquez attempted to send approximately $1.2 million dollars to the law firm previously representing him and defendant Diaz on November 26, 2018,[9] and subsequently through litigation tried to re-obtain the funds as they had been blocked by the financial institution receiving them.  Fifth, the United States has received information that the Defendants, or at least defendant Velasquez, are additionally in control of approximately $5 million dollars outside of the United States.  As such, the Defendants should each be ordered to pay a fine of $75,000, within the recommended sentencing guideline fine range and slightly above the low-end fine recommendation.

## IV.   **LEGAL STANDARD**

A "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [it] may

---

[9] This according to a civil complaint filed by defendant Velasquez against JP Morgan Chase & Co. to try to regain these funds. *Adrian Jose Velasquez Figueroa v. JP Morgan Chase & Co*., 22-CV-10035 (S.D.N.Y. 2022).

not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." *Id*. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct; [and]
>>
>> (C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

At sentencing, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C.

§ 3661.  Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

## V.  <u>SUBSTANTIAL TERMS OF IMPRISONMENT ARE WARRANTED</u>

Significant sentences of incarceration are warranted here given the nature and seriousness of the Defendants' criminal offenses, the Defendants' history and characteristics and the need for general deterrence. *See* 18 U.S.C. § 3553(a).  For these reasons, the Government respectfully submits that for defendant Diaz, a sentence of imprisonment of no less than 283 months is sufficient, but not greater than necessary, to satisfy the goals of sentencing.  For defendant Velasquez, a sentence of imprisonment of no less than 235 months is sufficient, but not greater than necessary, to satisfy the goals of sentencing.

### 1.  The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

First, the nature and circumstances of the Defendants' participation in an immense money laundering and bribery scheme involving more than a billion dollars in bonds and over a hundred million dollars in bribe payments warrants a significant sentence.  As proven at trial and detailed above at length, defendant Diaz and her husband, defendant Velasquez were at the very heart of this scheme; she was the high-ranking foreign official who accepted more than $136 million in bribes from Venezuelan billionaire businessman fugitive co-defendant Gorrin in exchange for approving the assignment of bonds owned by the Venezuelan National Treasury to Gorrin-controlled companies.  Defendant Velasquez, defendant Diaz's husband, was her front man who concealed those bribe payments through the creation and use of shell companies and offshore bank accounts, and then lavishly benefitted from those bribe proceeds.  Further, the Defendants' criminal activity in this case was not isolated; on the contrary, it extended over the course of years with both acting knowingly and deliberately.

Defendants' sentencing memorandum ignores the nature and circumstances of their criminal activity altogether and rather, as discussed above, recasts the nature and circumstances of the their offenses as a big misunderstanding between cultures as the Venezuelan economic market is different than the American economic market, and the permuta market in Venezuela allows Venezuelans to make money from the purchase and sale of currency.  They claim that this is all defendant Velasquez was doing, a perfectly legal exchange of currency.  Further, defendant Diaz again proffers that anyone could bid and win Treasury bond contracts after the abolishment of the casa de bolsas—implying that she had no power or authority as the National Treasurer to select who won these contracts, and besides the Venezuelan National Treasury made a profit on the transactions so there were no victims.  [DE 358 at 18-24].  These claims are belied by the evidence presented at trial, which resulted in the jury's return of guilty verdicts for both.

The Defendants' attempts to ignore, minimize, and distract from the actual and exceedingly serious nature and circumstances of their crimes should be rejected, and a substantial term of imprisonment for each is fitting.  It also demonstrates a lack of remorse for the crimes that they committed and the harm caused as a result of their greed and abuse of power.

Second, as to the Defendants' personal history and characteristics, there is nothing remarkable about the Defendants' age, education, physical or mental capacity, or family circumstances that suggest that they cannot be imprisoned for a term appropriate to their crime. They may argue that they are entitled to leniency because they have no criminal history.  While it is true that the Defendants have no prior criminal record, the evidence admitted at trial showed they participated in a separate money laundering scheme, involving the same type of foreign currency exchange with Maximillian Camino as they did with Gorrin and that it lasted greater than

a one-year span; this conduct was not an isolated act.  Trial Tr. 993:20-1042:11, Dec. 2, 2022; Trial Tr. 1040:17-1132:12, Dec. 5, 2022.

As for the alleged conduct against the Defendants and their family, the Defendants have not provided any proof of these acts to the Court or the Government, *e.g.* a police report.[10]  As such, these claims cannot be verified in any manner and are therefore not worthy of a downward variance in their sentencing.

It is true that the Defendants have been subject to OFAC sanctions since 2019, but as stated above, the Defendants still maintained a residence in Madrid, Spain and had retained outside legal counsel prior to their arrest on these criminal charges.  And, they continue to have privately retained legal counsel.  Therefore, it cannot be said that the sanctions had such a dramatic effect on their lives to warrant a downward variance in their sentence.

Simply put, the Defendants' personal history and characteristics do not justify a substantial deviation from their Guidelines range, a range that is consistent with the nature and circumstances of their offenses.

### 2. The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

The Defendants' offenses were extremely serious.  Bribery and money laundering have significant negative consequences at home and abroad and have consistently been recognized by leaders of this country for the harm they cause.

In 2021, President Joe Biden highlighted this reality, "[c]orruption threatens United States national security, economic equity, global anti-poverty and development efforts, and democracy

---

[10] The United States is aware of open-source reporting that defendant Diaz and others were allegedly extorted by individuals informing her that they could assist her with United State law enforcement so that she could avoid being criminally charged in the United States.

itself."[11]  The White House declared that, "[c]orruption is a cancer within the body of societies—a disease that eats at public trust and the ability of governments to deliver for their citizens.  The deleterious effects of corruption impact nearly all aspects of society.  It exacerbates social, political, and economic inequality and polarization; impedes the ability of states to respond to public health crises or to deliver quality education; degrades the business environment and economic opportunity; drives conflict; and undermines faith in government.  Those that abuse positions of power for private gain steal not just material wealth, but human dignity and welfare."[12]

In 2006, President George W. Bush similarly observed that "the culture of corruption has undercut development and good governance and . . . impedes our efforts to promote freedom and democracy, end poverty, and combat international crime and terrorism."[13]  The administrations of former President George W. Bush and former President Barack Obama both recognized the threats posed to security and stability by corruption.  For instance, in issuing a proclamation restricting the entry of certain corrupt foreign public officials, former President George W. Bush recognized "the serious negative effects that corruption of public institutions has on the United States' efforts to promote security and to strengthen democratic institutions and free market systems. . ." Proclamation No. 7750, 69 Fed. Reg. 2287 (Jan. 14, 2004).  Similarly, former President Barack Obama's National Security Strategy paper, released in May 2010, expressed the administration's

---

[11] Fact Sheet: US Strategy on Countering Corruption, *available at* https://www.whitehouse.gov/briefing-room/statements-releases/2021/12/06/fact-sheet-u-s-strategy-on-countering-corruption/.

[12] *Id.*

[13] President's Statement on Kleptocracy, 2 Pub. Papers 1504 (Aug. 10, 2006), *available at* http://georgewbush-whitehouse.archives.gov/news/releases/2006/08/20060810 html.

efforts and commitment to promote the recognition that "pervasive corruption is a violation of basic human rights and a severe impediment to development and global security."[14]

As for money laundering, the U.S. Department of State explained in 2001:

> Money laundering has devastating social consequences and is a threat to national security. It provides the fuel for drug dealers, terrorists, illegal arms dealers, *corrupt public officials* and other criminals to operate and expand their criminal enterprises. Crime has become increasingly international in scope, and the financial aspects of crime have become more complex, due to rapid advances in technology and the globalization of the financial services industry. Modern financial systems, in addition to facilitating legitimate commerce, permit criminals to order the transfer of millions of dollars instantly, using personal computers and satellite dishes. The criminal's choice of money laundering vehicles is limited only by his or her creativity. Money is laundered through currency exchange houses, stock brokerage houses, gold dealers, casinos, automobile dealerships, insurance companies, and trading companies. Private banking facilities, offshore banking, shell corporations, free trade zones, wire systems, and trade financing all have the ability to mask illegal activities. In doing so, criminals manipulate financial systems in the United States and abroad.

> Unchecked, money laundering can erode the integrity of a nation's financial institutions. Due to the high integration of capital markets, money laundering could also adversely affect currencies and interest rates as launderers reinvest funds where their schemes are less likely to be detected, rather than where rates of return are higher.

> Ultimately, this laundered money flows into global financial systems where it could undermine national economies and currencies. Money laundering is thus not only a law enforcement problem but poses a serious national and international security threat as well.[15]

The Defendants, however, argue that their alleged expulsion from Venezuela, alleged kidnapping and extortion in Spain, alleged family persecution in Venezuela, being investigated in Spain, and arrested in Spain and extradited to the United States are enough to promote respect for the rule of law and provide just punishment for their crimes. Therefore, they argue no additional

---

[14] The White House, National Security Strategy 38 (2010), *available at* https://obamawhitehouse.archives.gov/sites/default/files/rss_viewer/national_security_strategy.pdf.

[15] U.S. Department of State, Money Laundering and Financial Crimes Report, *available at* https://2009-2017.state.gov/j/inl/rls/nrcrpt/2000/959.htm (emphasis added).

punishment is necessary to satisfy these factors becausethey have been punished enough.   In addition, they cite *United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012) in support of their position that since this is their first brush with the United States legal system, this experience alone is an inherent punishment.  [DE 358 at 26-31].  *Prosperi*, however, involved a very different set of facts than here, specifically, defendants who were not involved in the underlying harm and who did not profit from their offenses.   Here the Defendants were fundamentally involved in the underlying bribery scheme and enriched themselves to the tune of over $136 million.   It is ludicrous to think that mere exposure to the United States legal system is enough punishment to promote respect for the law for these two sophisticated and cunning actors.  Further, the Guidelines already take the Defendants' argument into account when considering their criminal history category, by placing them into the lowest category.  Simply put, the Government disagrees with the Defendants' positions.  The sentences imposed should reflect the seriousness of the Defendants' offenses as well as the threat posed by corruption and money laundering more generally as discussed above.

### 3.  The Need for Adequate Deterrence

This factor also weighs in favor of a substantial sentence.  It is particularly challenging to investigate and successfully prosecute international money laundering and corruption schemes, especially where, as here, the scheme involves individuals and actions in multiple countries, foreign bank accounts, and other evidence that is located abroad.  This means that when such a scheme is uncovered, and a defendant convicted, a substantial sentence is warranted.  *See, e.g., United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence

the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

Thus, the Court should impose sentences significant enough to deter others from using the United States financial system to launder their illicit funds.

### 4. To Protect the Public From Further Crimes of the Defendant

This is not a situation where the Defendants, because of age or health, are no longer capable of carrying out their criminal activity. What they did could be carried out by anyone with their background and experience at any age or condition with access to a phone, a computer, and a bank account. As noted in the U.S. Department of State Report above, "[t]he criminal's choice of money laundering vehicles is limited only by his or her creativity." While the Government submits that this factor is not a central basis for sentencing in this case, the Defendants' misleading and/or vague answers as to their financial status should give pause as these outstanding answers could lead to attempts in the future to regain access to illicit funds from their crimes that they have not disclosed or that have not been accounted for, thus triggering new money laundering crimes or potentially subjecting others to liability based on their designated status on the Office of Foreign Asset Control ("OFAC") list.[16]

---

[16] The Defendants also make the argument that the OFAC list is "reserved for terrorists and those individuals that pose a threat to security of the United States." [DE 358 at 30]. The Defendants seem to be arguing that they have been unfairly punished by this designation. While certainly the OFAC sanctions list is applied to terrorists, it is also used to sanction corrupt actors and abusers of human rights. In September 2020, the United States Department of the Treasury's Office of Foreign Asset Control (OFAC) designated two individuals, "for their roles in providing support to persons previously designated for their own corrupt behavior." *See* Treasury Targets Support to Designated Corrupt Actors, *available at* https://home.treasury.gov/news/press-releases/sm1122. In December 2022, OFAC sanctioned over 40 individuals and entities across nine countries connected to corruption and human rights abuse. *See* Treasury Sanctions Over 40 Individuals and Entities Across Nine Countries Connected to Corruption and Human Rights Abuse,

**5.   To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

The Government submits that these factors are not a central basis for sentencing in this case.

**6.  The Kinds of Sentences Available**

The Government submits that this factor does not affect the analysis.  There can be no serious argument for any sentence other than imprisonment for the Defendants, one who abused her position of trust to profit greatly, and another who used that same position to enrich himself as well.  The crimes were as brazen as they were sophisticated, and a jury convicted them for their knowing and deliberate criminal actions.

**7.  The Kinds of Sentence and the Sentencing Range**

As discussed above, defendant Diaz's restricted Guidelines term of imprisonment is 480 months and defendant Velasquez's Guideline term is 235-293 months' imprisonment.   The Government submits that to serve the legitimate purposes of sentencing, including promotion of respect for the law and general deterrence, the Court should sentence defendant Diaz to a

---

*available at* https://home.treasury.gov/news/press-releases/jy1155.  Any argument that the Defendants are uniquely situated because they were placed on the OFAC sanctions list as a result of their corruption, as opposed to an offense like terrorism, is toothless.  In addition, OFAC has sanctioned several individuals, including government officials for their connection to Venezuelan corruption.  See Treasury Targets Venezuelan Oil Sector Sanctions Evasion Network, Jan. 19, 2021, U.S. Dept. of Treasury,  https://home.treasury.gov/news/press-releases/sm1239 (last visited April 15, 2023);  see also  Venezuela-related  Designations,  July  25,  2019,  U.S.  Dept.  of  Treasury, https://ofac.treasury.gov/recent-actions/20190725 (last visited April 15, 2023); Venezuela-related Designations, Sept. 17, 2019, U.S. Dept. of Treasury, https://ofac.treasury.gov/recent-actions/20190917 (last visited April 15, 2023).

Secondarily, the Defendants argue that they were placed on the OFAC list because they failed to cooperate with the United States.  On January 8, 2019, the Defendants (and their fugitive co-defendant Gorrin among others) were designated pursuant to Executive Order 13850, after having been determined to be responsible for or complicit in, or to have directly or indirectly engaged in, any transaction or series of transactions involving deceptive practices and corruption and the Government of Venezuela or projects or programs administered by the Government of Venezuela, or are immediate family members of such a person who held properties or owned or controlled companies on that person's behalf.  Contrary to their allegation, lack of cooperation played no part in their designation.

substantial term of imprisonment of no less than 283 months and defendant Velasquez to a substantial term of imprisonment at the low end of his Guidelines range of no less than 235 months.

### 8.   Any Pertinent Policy Statement Issued by the Sentencing Commission

There are no policy statements in the Sentencing Guidelines that justify a substantial variance for the Defendants.  The Government reserves the right to supplement our position based on any relevant filing the Defendants may submit implicating other policy statements.

### 9.   The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

The purpose of the Sentencing Guidelines is to ensure "reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders."   U.S.S.G. Ch. 1.3.   Application of a within-Guidelines sentence preserves uniformity among sentences.  The Government is unaware of any unwarranted disparity between the Defendants' proposed sentences and others, however, we reserve the right to supplement our position at the sentencing hearing.

The cases that the Defendants cite are not applicable for a variety of reason, primarily that none of them have similar facts regarding acceptance of responsibility, total bribe amount, total benefit received as a result of the bribes, and falsely testifying at trial, however, we reserve the right to supplement our position at the sentencing hearing.

Co-Conspirator Alejandro Andrade cooperated with the United States government in this criminal matter in 2017, prior to being charged.  Andrade, while continuing to cooperate, then pleaded guilty to an Information charging him with participating in a money laundering conspiracy with a ten-year imprisonment cap. *United States v Andrade*, 17-cr-80242-RLR DE 3, 9 (S.D.F.L. 2017).  Andrade was initially sentenced to 120 months imprisonment. [*Id*. at DE 53].  Andrade surrendered to the Bureau of Prisons and began serving his term of imprisonment.  On October 18,

2021, Andrade's judgment was amended pursuant to a government motion for a sentencing reduction to a sentence of 42 months imprisonment based on his cooperation. [*Id*. at 92]. Eventually, Andrade was released from the custody of the Bureau of Prisons. After his release, Andrade continued to cooperate with the government, including testifying at the Defendants' trial. As such, Andrade's sentence cannot and should not be used to determine the Defendants' sentence. Andrade cooperated with the government and thus, received a benefit – a sentence reduction.

Last month, a former banker from Goldman Sachs was sentenced to 120 months, or ten years, for his role in the 1MDB corruption scheme. *United States v. Ng Chong Hwa, also known as "Roger Ng"*, 1:18-cr-00538 (E.D.N.Y. 2022).[17] Ng was convicted by a jury for his role in a massive bribery and money laundering scheme to steal billions of dollars from the Malaysian government. Ng's role was as a middle-man banker, who used his position within Goldman Sachs, to work with the protagonists of the bribery scheme to structure bond deals used to cover up the bribes. For his role, Ng profited more than $35 million. Ng's conduct was serious and sophisticated, and the seriousness is reflected in his 10-year sentence of imprisonment. However, the facts in Ng are distinct from the instant matter. Here, the Defendants *were* the protagonists of the bribery scheme. Defendant Diaz was the public official, she had the authority, and it was that very authority she abused to perpetrate the scheme. Defendant Velasquez was her front man, her accomplice, whose role was to set up the foreign bank accounts to try to hide the profits of this scheme from the light of day. As opposed to the $35 million that Ng profited from his role, the Defendants made over $136 million in corrupt proceeds, nearly four times as much. Furthermore,

---

[17] The Government advocated for a sentence of 15 years of imprisonment for Ng.

as it relates to defendant Diaz, she took the stand and testified falsely – something Ng never did. The Defendants' case is distinguishable from Ng for these very reasons.

In 2017, Mahmoud Thiam, the former Minister of Mines and Geology of the Republic of Guinea was sentenced to seven years for receiving and laundering $8.5 million in bribes. *United States v. Mahmoud Thiam*, 17-cr-047 (S.D.N.Y. 2017).[18]   Similar to Diaz, Thiam abused his position of power to corruptly enrich himself.  His conduct was serious, as was his sentence.  But the facts here are a far cry from those in Thiam.  Here, the Defendants received over $136 million in bribes, and awarded over a billion dollars in corrupt contracts – all of this in just a period of two years.  The severity and magnitude of the conduct by the Defendants is distinct from Thiam, and their sentence should reflect this difference.

In 2012, in this district, Joel Esquenazi was sentenced to 180 months' imprisonment for his role in making bribe payments of over $800,000 to Haitian officials in exchange for business. *United States v. Joel Esquenazi, Et. Al.,* 09-CR-21010 (S.D.F.L. 2009).  Esquenazi, who was president of the telecom company who paid the bribes to Haitian officials to win large government contracts, appropriately received a significant sentence for his corrupt conduct.  However, the Defendants criminal conduct was far more significant, their abuse of defendant Diaz's position of power far more brazen, and the amount and magnitude of the bribes and business involved merits a more significant sentence here.

**10.  The Need to Provide Restitution to Any Victims of the Offense**

There is no issue of restitution in this case, § 3553(a)(7), so that factor is not addressed here.

---

[18] The Government advocated for a guidelines sentence for defendant Thiam of 151 to 188 months' imprisonment.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court to sentence defendant Diaz to a substantial term of imprisonment of no less than 283 months and defendant Velasquez to a substantial term of imprisonment at the low end of his Guidelines range of no less than 235 months, along with a fine, which would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully Submitted,

GLENN S. LEON                      MARKENZY LAPOINTE
CHIEF, FRAUD SECTION               UNITED STATES ATTORNEY

By:   */s/ Paul A. Hayden*         By:   */s/ Kurt K. Lunkenheimer*
      PAUL A. HAYDEN                      KURT K. LUNKENHEIMER
      MICHAEL CULHANE HARPER              Assistant United States Attorney
      Trial Attorneys                    Court ID No. A5501535
      Fraud Section, Criminal Division   U.S. Attorney's Office - SDFL
      U.S. Department of Justice         99 N.E. 4th Street, Suite 600
      1400 New York Avenue, N.W.         Miami, FL 33132-2111
      Washington, D.C. 20005             Telephone: (305) 961-9008
      Telephone: (202) 353-9370          Email: Kurt.Lunkenheimer@usdoj.gov
      Email: paul.hayden2@usdoj.gov